**Larry R. BRADLEY, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 03–CM–370.

District of Columbia Court of Appeals.

Argued April 13, 2004.
Decided Sept. 2, 2004.

---

Edward DeV. Bunn, appointed by the court, for appellant.

Gary K. Milligan, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, and Catherine K. Connelly, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and WASHINGTON, Associate Judges, and NEBEKER, Senior Judge.

PER CURIAM.

Appellant Larry R. Bradley ("Bradley") was convicted in a bench trial of one count of simple assault[1] and one count of attempted second-degree cruelty to children[2] in connection with a beating that he gave his eight-year-old son, D.M., on May 4, 2001. On appeal, Bradley asks that we vacate his conviction for second-degree cruelty to children because that offense merges with simple assault. Alternatively, Bradley argues that the rule of lenity demands that his cruelty conviction be vacated. Bradley also alleges that he was denied his Fifth and Sixth Amendment rights to due process and a speedy trial because

---

1. In violation of D.C.Code § 22–404 (2001).

2. In violation of D.C.Code §§ 22–1101(b), – 1803 (2001).

nearly twenty-one months passed between the incident for which he was charged and his trial. We affirm.

## I.

At trial, the government presented evidence that on May 4, 2001, D.M. had gotten into a fight with another · child at school. D.M.'s mother testified that after the school informed her about the fight, she telephoned Bradley and asked him to discipline D.M. for the incident. Although Bradley was not living with D.M. or D.M.'s mother at the time, he came over to their house later in the day. D.M. testified that his father took him into his bedroom and made him stand in a corner. Then, according to D.M., his father began to beat him, striking him with a closed fist approximately seven times on the face and chest, and then kicking him after he fell to the floor. The beating left D.M. with a split lip and a number of bruises below his left eye, across his right temple, on his left cheek, and on his upper chest, arms, shoulders, and back.[3] D.M.'s mother testified that, the next day, she reported the incident to the police who directed her to bring D.M. to the hospital for an examination. In his defense, Bradley testified that he could not recall what had happened on May 4, 2001, and denied physically disciplining his son.

Although the court found that there was "considerable confusion" as to when D.M.'s mother discovered the injuries and how the case came to the attention of the police, the court credited D.M.'s testimony, finding "ample corroboration" for D.M.'s testimony that Bradley had beaten him. The trial court discredited Bradley's claim that he could not remember beating his son. With respect to the fight that had occurred that day at school, the court found it "highly ... unlikely, that [D.M.] could have sustained all these injuries at school and nobody had done anything about them." Ultimately, the trial court convicted Bradley of simple assault and attempted second-degree child cruelty. Bradley noted the instant appeal.

## II.

 The Double Jeopardy Clause of the Fifth Amendment to the Constitution " 'protects against multiple punishments for the same offense.' " *Byrd v. United States*, 598 A.2d 386, 388 n. 4 (D.C.1991) (en banc) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)). This constitutional guarantee is limited, however; it merely prevents the court from imposing a punishment in excess of what the legislature intended. *Id.* (citing *Albernaz v. United States*, 450 U.S. 333, 334, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981)). Therefore, when two different legislative provisions criminalize one course of conduct, the court must determine whether the legislature intended to punish the conduct under both provisions. When we lack direct evidence of the legislature's intent to impose multiple punishments for a single act, we apply the rule adopted in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *Byrd*, 598 A.2d at 389. "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is *whether each provision requires proof of a fact which the other does not*." *Id.* (quoting *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180) (emphasis added) (alteration in original). In the District of

---

**3.** Allison McCarley, the pediatrician at Children's National Medical Center who treated D.M. for his injuries, provided corroborative testimony about the extent of D.M.'s injuries.

According to Dr. McCarley, D.M. also told her that his father had "hit him with his fist and kicked him."

Columbia, the *Blockburger* rule has been codified in D.C.Code § 23–112 (2001).[4] *See id.*

▮ In the instant case, we are called upon to determine whether Bradley's conviction for simple assault[5] merges with his conviction for attempted second-degree child cruelty.[6] Whether these two crimes merge is a question of first impression for this court. *See York v. United States,* 803 A.2d 1009, 1012 (D.C.2002) (stating that we need not decide "whether assault is a lesser included offense of first and second degree cruelty to a child"). We review this issue *de novo. See Nixon v. United States,* 730 A.2d 145, 151 (D.C.1999) (citing *Spain v. United States,* 665 A.2d 658, 662 n. 5 (D.C.1995)).

▮ *Blockburger,* as codified in § 23–112, requires us to examine only the "statutorily-specified elements of each offense" rather than the specific facts of a given case. *Byrd,* 598 A.2d at 389. Accordingly, we turn now to the elements of simple assault and second-degree child cruelty. Although simple assault is not defined by the statute, analysis under the "elements" test for lesser-included offenses is still appropriate and the elements to be examined are those found in the common law definition of assault. *See Mungo v. United States,* 772 A.2d 240, 245 (D.C.2001). As charged in the instant case, simple assault consists of three elements: "(1) an act[7] on the part of the accused (which need not result in injury); (2) the apparent present ability to injure the victim at the time the act is committed; and (3) the intent to perform the act which constitutes the assault at the time the act is committed." *Ruffin v. United States,* 642 A.2d 1288, 1295 (D.C.1994) (citations omitted). The elements of second-degree child cruelty include: "intentionally, knowingly or recklessly ... [m]altreat[ing] a child or engag[ing] in conduct which causes a grave risk of bodily injury to a child." D.C.Code § 22–1101(b)(1). Both simple assault and second-degree child cruelty are general intent crimes. *See, e.g., Smith v. United States,* 813 A.2d 216, 220 n. 6 (D.C.2002); *Newby v. United States,* 797 A.2d 1233, 1241 (D.C.2002).

The two offenses do not merge because each requires an element of proof that the other does not. For instance, the cruelty offense requires proof that the act be committed upon a child, D.C.Code § 22–

---

4. D.C.Code § 23–112 states:
 A sentence imposed on a person for conviction of an offense shall, unless the court imposing such sentence expressly provides otherwise, run consecutively to any other sentence imposed on such person for conviction of an offense, whether or not the offense (1) arises out of another transaction, or (2) arises out of the same transaction and requires proof of a fact which the other does not.

5. Without defining "simple assault," D.C.Code § 22–404(a) provides that "[w]hoever unlawfully assaults, or threatens another in a menacing manner, shall be fined not more than $1,000 or be imprisoned not more than 180 days, or both."

6. D.C.Code § 22–1101(b) states: "[a] person commits the crime of cruelty to children in the second degree if that person intentionally, knowingly, or recklessly:

 (1) Maltreats a child or engages in conduct which causes a grave risk of bodily injury to a child; or
 (2) Exposes a child, or aids and abets in exposing a child in any highway, street, field house, outhouse or other place, with intent to abandon the child.

7. We have defined the requisite "act" as " 'either an actual attempt, with force or violence, to *injure another,* or a menacing threat, which may or may not be accompanied by a specific intent to injure, on the part of the defendant.' " *Nathaniel Robinson v. United States,* 506 A.2d 572, 574 (D.C.1986) (quoting *Williamson v. United States,* 445 A.2d 975, 978 (D.C.1982)).

1101(b), while simple assault has no such requirement. *Ruffin*, 642 A.2d at 1295. Conversely, simple assault requires an affirmative act involving "force or violence," or the threat thereof, while the cruelty offense may be committed by simply "[m]altreat[ing] a child." The word "maltreat" encompasses more than mere physical abuse. According to Webster's Dictionary, maltreat means "to treat roughly or unkindly; abuse." WEBSTER'S NEW WORLD DICTIONARY THIRD COLLEGE EDITION 819 (1988). This broader definition of "maltreat" is consistent with the way the term is used in D.C.Code § 22–1101(a), governing first-degree child cruelty. There, the word "maltreat" is not limited to physical torture or beating, as would constitute common law assaultive conduct, but includes *any* act of willful maltreatment. *See* D.C.Code § 22–1101(a) (stating that "[a] person commits the crime of cruelty to children in the first degree if that person intentionally, knowingly, or recklessly tortures, beats, *or otherwise willfully maltreats* a child under 18 years of age . . . ."). Similarly, our neglect statute defines an "abused" child as one "whose parent . . . inflicts, or fails to make reasonable efforts to prevent the infliction of, physical or mental injury upon the child . . . ." D.C.Code § 4–1301.02(1) (2001). The inclusion of "mental injury" in our neglect statute indicates that the drafters intended to prohibit more than physical violence or assaultive conduct. *Compare Robinson*, 506 A.2d at 574, *with* D.C.Code § 22–1101(b)(1). Furthermore, simple assault must be established by showing that the defendant's actions would reasonably injure or frighten the victim *at the time the act is committed*, *Ruffin*, 642 A.2d at 1295, while the cruelty offense does not require that the defendant's act be contemporaneous with the risk of grave injury to the child. D.C.Code § 22–1101(b)(1).

To illustrate these distinctions, a mother could be charged with child cruelty for failing to provide adequate food and nutrition for her child over a period of many months, *see generally Young v. United States*, 745 A.2d 943 (D.C.2000), but this failure would not constitute an "assault," at least not initially, because she lacks the "apparent present ability" to injure her child by withholding food. *See Anthony v. United States*, 361 A.2d 202, 205 (D.C. 1976) (stating that "at the time of the assault the surrounding circumstances must denote the intention and present ability to do *immediate violence*") (emphasis added). Furthermore, the failure to provide food is an omission which does not involve "force or violence" or the threat thereof. Therefore, the offense of second-degree cruelty to children does not merge with simple assault.

■ Bradley asks that we apply the rule of lenity in this case to sentence him concurrently rather than consecutively on his convictions for simple assault and attempted second-degree child cruelty. The rule of lenity operates to prohibit consecutive sentences when "a single act or transaction constitutes two criminal offenses, *unless* (1) the offenses are separate and distinct, and (2) there is a clear legislative intent to provide for consecutive punishment." *Jones v. United States*, 401 A.2d 473, 475 (D.C.1979) (internal citations and quotation marks omitted) (emphasis added). We have described the rule of lenity as "a rule of statutory construction which requires a court to construe a penal statute so it will apply in the least onerous fashion when the statute is capable of more than one reasonable construction." *Id.* at 476 (citation omitted). Accordingly, in *Nixon*, 730 A.2d at 145, we applied the rule of lenity to our statute prohibiting the possession of a firearm during a crime of violence ("PFCV")[8] because the statute did

---

8. D.C.Code § 22–3204(b) (1996), recodified at D.C.Code § 22–4504(b) (2001).

not specify whether the possession of a single firearm during a single violent act against multiple victims could give rise to multiple convictions under that statute. *Id.* at 153.

In this case, our application of the *Blockburger* test has shown that second-degree child cruelty and simple assault are "separate and distinct" offenses. In addition, D.C.Code § 23–112 establishes the legislature's clear intent to impose consecutive sentences for two or more offenses arising out of a single criminal act. *See Byrd,* 598 A.2d at 389. Because Bradley has not pointed to any ambiguity in either statute that would require application of the rule of lenity, we will not disturb the trial court's decision to impose consecutive sentences in this case. *See Jones,* 401 A.2d at 476 (stating that when "the conditions for lenity are not present the court may sentence consecutively or concurrently, but the decision to do so is not reviewable by this court").

### III.

In addition to his merger claim, Bradley asserts for the first time on appeal that the delay of nearly twenty-one months between the date he committed the offense against D.M. and his trial for that offense violated his constitutional rights to a speedy trial under the Sixth Amendment and to due process under the Fifth Amendment. The incident in question occurred on May 4, 2001. Although an initial arrest warrant was issued on May 31, 2001, that warrant expired, and on June 4, 2002, the government received a reissued warrant. Bradley was arrested on September 12, 2002, more than sixteen months after the incident. The next day, Bradley was released on his own recognizance, and although he was instructed to return to court on October 1 for a hearing, he failed to appear. The hearing was reset for October 10 and the trial was initially scheduled for December 10, 2002. On Decem-

ber 9, however, the government sought to have the trial date converted to a status hearing in order to seek medical records and photographs of D.M.'s injuries from the Children's National Medical Center. Bradley agreed to the continuance, and the trial commenced on January 27, 2003, four and one-half months after his arrest, and nearly twenty-one months after the incident for which he was charged. Bradley did not, at that time, allege that his Fifth or Sixth Amendment rights were violated by the delay in prosecution. While Bradley's failure to raise these constitutional claims in the trial court would normally result in our reviewing them under a plain error standard, *see Coates v. United States,* 705 A.2d 1100, 1104 (D.C.1998), we have decided to review his contentions in a more plenary fashion.

■■■ On appeal, Bradley asks us to consider the entire twenty-one month period between the incident and trial when analyzing his speedy trial claims. Bradley misapplies the legal standards governing speedy trial violations, however, by calculating his delay in this manner. A defendant's Sixth Amendment right to a speedy trial applies only to the period of time between arrest or formal indictment and trial. *See United States v. Alston* 412 A.2d 351, 355 (D.C.1980) (en banc) (citing *United States v. Marion,* 404 U.S. 307, 321, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). Pre-arrest delay is, therefore, outside the scope of the Sixth Amendment. *See United States v. Lovasco,* 431 U.S. 783, 788–89, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (citing *Marion,* 404 U.S. at 320, 92 S.Ct. 455). In contrast, the Fifth Amendment's due process clause prohibits unreasonable delay *prior* to arrest or indictment. *See, e.g., Harrison v. United States,* 528 A.2d 1238, 1239 (D.C.1987); *Lovasco,* 431 U.S. at 788–89, 97 S.Ct. 2044 (holding that due process clause, not speedy trial clause, governs

analysis of pre-indictment delay). Therefore, when determining whether there was unconstitutional delay in this case, we do not consider the entire two-year period between the crime, itself, and the trial. Rather, when evaluating Bradley's Sixth Amendment claim, we consider the four and one-half month period between the date of Bradley's arrest and his trial. Alternatively, when evaluating Bradley's Fifth Amendment claim, we consider the sixteen-month period between Bradley's crime and subsequent arrest.

### A. Bradley's Sixth Amendment Speedy Trial Claim

■■■■■■ This court applies a four-factor test when analyzing Sixth Amendment speedy trial claims. *See Graves v. United States*, 490 A.2d 1086, 1090–91 (D.C.1984) (en banc). The four factors include: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant. *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). "These factors are related and must be considered together with other relevant circumstances in 'a difficult and sensitive balancing process.'" *Id.* (quoting *Barker*, 407 U.S. at 530, 92 S.Ct. 2182). As for the length of delay in this case, only four and one-half months elapsed between Bradley's arrest and his trial, which by itself, is not a significant delay. *See Dickerson v. United States*, 650 A.2d 680, 684 (D.C.1994) ("While a twenty-month delay is substantial, this court has held that delays of that length and even longer do not, standing alone, constitute a violation of the right to a speedy trial."). With respect to the reason for the delay, it appears that the four-

month period between Bradley's arrest and trial was primarily attributable to the normal processing of the case by the trial court,[9] which should not weigh heavily against the government. *See Graves*, 490 A.2d at 1092–93. As for the third factor, we note that Bradley failed to raise his Sixth Amendment concerns to the trial court, undermining his argument that he was denied a speedy trial. *See District of Columbia v. Cruz*, 828 A.2d 181, 183 (D.C. 2003). Finally, although Bradley attempts to demonstrate prejudice by claiming that as a result of the delay he "did not recall any of the events of the crimes for which he was charged," the trial court specifically discredited this claim. We are not in a position to second guess the trial court's credibility determination. *See Lee v. United States*, 668 A.2d 822, 833 n. 26 (D.C. 1995) (citing *In re S.G.*, 581 A.2d 771, 774–75 (D.C.1990)). To the extent that the trial court found that the passage of time adversely affected other witnesses' ability to recall the sequence of events which led to the reporting of the incident, the trial court attributed this effect to the "considerable amount of time [which] elapsed between the alleged incident and the filing ... of the charges" and not to the brief period between arrest and trial that is at issue here. Considering these four factors together, we find that Bradley's Sixth Amendment speedy trial rights were not violated in this case.

### B. Bradley's Fifth Amendment Due Process Claim

■■■■■■ To prevail on his claim that a *pre*-arrest delay violated his due process rights under the Fifth Amendment, Bradley must establish that he was "actually

---

9. Although the government did request that the December 10, 2002 trial date be converted to a status hearing, at which point the trial was continued for another month and a half, Bradley agreed to the continuance. There-

fore, we do not find this delay to be significant. In addition, by failing to appear at the October 1, 2001 hearing, Bradley actually caused some of the delay of which he now complains.

prejudiced" as a result of an "unjustified" delay by the government. *Asbell v. United States,* 436 A.2d 804, 812 (D.C.1981) (citations omitted).[10] Again, Bradley asserts that he was prejudiced, in part, because he could not recall what he was doing the day his son was allegedly beaten. This argument, however, is foreclosed by our holding in *Harrison,* 528 A.2d at 1238, that a defendant's "asserted lack of memory ... is insufficient to establish prejudice." *Id.* at 1239. Moreover, although the trial court found that D.M. and his mother could not explain the precise sequence of events, this prejudice is minor given the trial court's conclusion that those witnesses offered credible testimony on the critical aspects of the crime. In addition, the trial court found that D.M.'s version of the story had "ample corroboration."

■■■ " '[I]n the absence of severe prejudice, pre-arrest delay will not support a due process claim when the government's actions have been negligent, but not reckless or intentional.' " *United States v. Day,* 697 A.2d 31, 34 (D.C.1997) (quoting *Dahl Robinson v. United States,* 478 A.2d 1065, 1066 (D.C.1984) (citation omitted)) (alteration in original). It is unclear why the government waited as long as it did to arrest Bradley. However, as was the case in *Asbell,* "no unseemly motives can be ascribed to the government on this record." *Asbell,* 436 A.2d at 812. Because the record does not support a finding that the government deliberately sought to hinder the defense or acted recklessly in failing to arrest Bradley in a timely manner, and because Bradley was not severely

prejudiced by the delay, we do not find a due process violation in this case.

*Affirmed.*

---

10. In his reply brief, Bradley argues that D.C.Code § 23–563(b) (2002) operates as a "statute of limitations" preventing the government from pursuing the charges listed in a warrant after that warrant expires. His argument is baseless. Although D.C.Code § 23– 563(b) does establish that a warrant may not be executed more than one year after it is issued, it does not prohibit the court from reissuing the warrant. In this case, Bradley was properly arrested within a year of the date the second warrant was issued.